## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

**STEVE M. TRIMBLE & TINA F. GILL**                                    **PLAINTIFFS**

**v.**                               **CASE NO. 4:06-CV-0000672 GTE**

**CHARLES C. MORGAN & MARGIE A. MORGAN**                   **DEFENDANTS**

## ORDER

Presently before the Court are Defendants' Motion for Summary Judgment and

Defendants' *Daubert* Motion to Exclude Testimony of Plaintiffs' Expert.

**I. Background**[1]

In 1999, Defendants Charles and Margie Morgan ("the Morgans") purchased a home

located at 40 Hibiscus Cove in Maumelle, Arkansas ("the Property").  In 2005, the Morgans

decided to move to Nashville, Tennessee, and listed their home for sale with Walt Dickinson of

Re/Max Affiliates Realty.  When the Morgans listed their home, they completed a Seller Property

Disclosure form, which stated in pertinent part:

> **Purpose of Statement:** This is a statement of conditions and information
> concerning the Property.  Unless otherwise advised, the Seller does not possess
> any expertise in construction, architecture, engineering or any other specific areas
> related to the construction or condition of improvements on the Property or the
> Property itself, other than occupying or having ownership of the Property.  The

---

[1]The Court notes that Plaintiffs failed to properly respond to Defendants' Statement of
Material Facts.  In the Final Scheduling Order issued by the Court on September 9, 2006, the
non-moving party is directed to "first respond paragraph by paragraph to the statement of
undisputed material facts submitted by the moving party."  The Court further explained, "The
non-moving opposing party shall format the responsive portion of her statement like Requests for
Admission.  That is, she should repeat the statement verbatim as set forth in the moving party's
statement and respond to it by admitting the statement or pointing out that portion of the
statement, if any, she disputes."

Seller possesses no greater knowledge than that which could be obtained by inspection of the Property by potential buyers, lessees, tenants or their representatives.  This statement is not a warranty of any kind by the Seller, Listing Agent Firm or any subagent of Listing Agent Firm.  **THIS DISCLOSURE IS NOT A SUBSTITUTE FOR INSPECTIONS.  ANY POTENTIAL PURCHASER OF THE PROPERTY IS ENCOURAGED TO OBTAIN A PROFESSIONAL, PERSONAL OR OTHER INSPECTION PRIOR TO PURCHASING, LEASING, EXCHANGING, RENTING OR OFFERING TO PURCHASE THE PROPERTY.**[2]

It also stated that "[e]ven though this is not a warranty, the Seller hereby specifically makes the following representations based on the Seller's knowledge as of the above date."[3]

Additionally, the Morgans answered each of the following questions on the Seller Property Disclosure form by checking the "No" response:[4]

To the best of my knowledge, concerning the Property referenced above:

5.  Are there room additions, structural modifications or other alterations or repairs made to the Property since the Property was originally constructed?
. . .
9.  Has there been any flooding, drainage, grading problems, or has water ever stood on the property or under any improvement constructed thereon?

10.  Has there been any damage to the Property or any of the structures from fire, earthquake, storms, floods or landslides prior to or during your ownership?
. . .
20.  Is any of the Property in the floodplain or floodway?
. . .
22.  Has there ever been a problem with the roof of any of the improvements on the Property, such as defective shingles, damaged shingles, leaking or otherwise, or have you become aware of possible problems with the roof of any of the improvements on the Property that may occur in the future?

---

[2]Exhibit J, Seller Property Disclosure form, Defendants' Motion for Summary Judgment ("Defendants' Motion").

[3]Exhibit J, Seller Property Disclosure form, Defendants' Motion.

[4]Although the Complaint discusses additional questions, Plaintiffs only discuss the following in opposing Defendants' Motion for Summary Judgment.

2

. . .

34.  Are you aware of any facts, circumstances or events on or around the Property which, if known to a potential buyer, could adversely affect in a material manner the value or desirability of the Property?

. . .

41.  Are there any other defects in the Property known to you?[5]

Plaintiffs signed the form, which also stated:

> **WE ACKNOWLEDGE RECEIPT OF A COPY OF THIS SELLER PROPERTY DISCLOSURE.  WE UNDERSTAND THAT THE ABOVE STATEMENTS ABOUT THE PROPERTY ARE TRUE AND CORRECT TO THE BEST OF THE SELLER'S KNOWLEDGE AS OF THE ABOVE DATE.  IT IS NOT A WARRANTY OF ANY KIND BY SELLER OR SELLER'S AGENT AND IS NOT A SUBSTITUTE FOR ANY INSPECTIONS BUYER, LESSEE OR TENANT MAY WISH TO OBTAIN.[6]**

Plaintiffs, who were interested in purchasing a home, looked at the Property at least two times in September of 2005.[7]  Plaintiffs took a video of the Property during one of those visits.[8]  Plaintiffs made an offer on the Property on September 11, 2005 at 10:00 a.m., which was accepted by Defendants the same day at 7:00 p.m.[9]  The offer was made "contingent upon the Buyers satisfaction of the inspection."[10]  Section 16, the "Seller Property Disclosure" section, required that the Defendants provide the Plaintiffs the "written disclosure about the condition of

---

[5]Exhibit J, Seller Property Disclosure form, Defendants' Motion.

[6]Exhibit J, Seller Property Disclosure form, Defendants' Motion.

[7]Exhibit F, Trimble Dep. p. 11, Defendants' Motion; Exhibit G, Gill Dep. p. 7, Defendants' Motion.

[8]Exhibit F, Trimble Dep. p. 11, Defendants' Motion; Exhibit G, Gill Dep. p. 7, Defendants' Motion.

[9]Exhibit H, Real Estate Contract, Defendants' Motion.

[10]Exhibit H, Real Estate Contract, Defendants' Motion.

the Property which will contain information that is true and correct to the best of the Seller's

knowledge" "in a timely manner" after acceptance of the Contract.[11]  The Buyer's Disclaimer of

Reliance provides:

> **BUYER CERTIFIES BUYER HAS PERSONALLY INSPECTED OR WILL PERSONALLY INSPECT, OR HAS HAD OR WILL HAVE A REPRESENTATIVE INSPECT, THE PROPERTY AS FULLY AS BUYER DESIRES AND IS NOT RELYING AND SHALL NOT HEREAFTER RELY UPON ANY WARRANTIES, REPRESENTATIONS OR STATEMENTS OF THE SELLER . . . REGARDING THE AGE, SIZE (INCLUDING WITHOUT LIMITATION THE NUMBER OF SQUARE FEET IN IMPROVEMENTS LOCATED ON THE PROPERTY), QUALITY, VALUE OR CONDITION OF THE PROPERTY, INCLUDING WITHOUT LIMITATION ALL IMPROVEMENTS, ELECTRICAL OR MECHANICAL SYSTEMS, PLUMBING OR APPLIANCES, OTHER THAN THOSE SPECIFIED HEREIN (INCLUDING ANY WRITTEN DISCLOSURE PROVIDED BY SELLER AND DESCRIBED IN PARAGRAPH 16 OF THIS REAL ESTATE CONTRACT), IF ANY, WHETHER OR NOT AN EXISTING DEFECTS IN ANY SUCH REAL OR PERSONAL PROPERTY MAY BE REASONABLY DISCOVERABLE BY BUYER OR A REPRESENTATIVE HIRED BY BUYER. . . . LISTING AGENT FIRM AND SELLING AGENT FIRM STRONGLY URGE . . . PROPERTY CONDITION, SQUARE FOOTAGE OF IMPROVEMENTS OF THE PROPERTY . . . SHOULD EACH BE INDEPENDENTLY VERIFIED AND INVESTIGATED.[12]**

The "Inspection and Repairs" section of the Real Estate Contract ("the Contract")

provided:

> Buyer shall have the right, at Buyer's expense, with the cooperation of Seller, to inspect the electrical, mechanical, plumbing, environmental conditions, appliance, roof and structure,[13] and all improvements, structure(s) and components on or about the Property (collectively the "inspection items" within TEN (10) BUSINESS DAYS after the date his Real Estate Contract is accepted.  Seller

---

[11]Exhibit H, Real Estate Contract, Defendants' Motion.

[12]Exhibit H, Real Estate Contract, Defendants' Motion.

[13]The words "roof and structure" were written in by hand.

agrees to have all utilities connected and turned on to subject property to allow Buyer to inspect and re-inspect inspection items.  Seller, Listing Agent Firm and Selling Agent Firm recommend Buyer use a representative(s) chosen by Buyer to inspect inspection items.[14]

Plaintiffs, their real estate agent, their decorator, and Mr. Trimble's brother looked at the home prior to closing.[15]  Mr. Trimble stated in his deposition that, prior to closing on the house, the decorator told Ms. Gill that there appeared to be water stains in the dormer area of the second bedroom, and Ms. Gill relayed that information to him, but he did not do anything about it, did not see it himself, and did not inform the inspector about the possible water stains.[16]  Ms. Gill also testified that she did not see any water stains, but the decorator stated that a place in the upstairs second bedroom had a slight difference in paint color that looks like it had been repaired or something had been covered up.[17]

Plaintiffs also hired a professional inspection company to inspect the home.  On September 19, 2005, Plaintiff's completed the Inspection, Repair and Survey Addendum, which requested that Sellers repair a condenser coil on the air conditioner, which was "slightly out of level," and to seal an opening in the evaporator coil on the air conditioner.[18]  Additionally, Plaintiffs requested that the Morgans repair the magnetic strip on the shower stall, the 120 volt outlets in the master bathroom, the weather strip on the rear doors, and gaps between the brick

---

[14]Exhibit H, Real Estate Contract, Defendants' Motion.

[15]Exhibit F, Trimble Dep. p. 14-15, Defendants' Motion; Exhibit G, Gill Dep. p. 7, Defendants' Motion.

[16]Exhibit F, Trimble Dep. p. 50-51, Defendants' Motion.

[17]Exhibit E, Gill Dep. p. 18, Plaintiff's Response to Defendants' Motion.

[18]Exhibit I, Repair Addendum, Defendants' Motion.

and window frame in two areas.[19]  Plaintiffs also requested repair of the roof and flashing as

described on an attached inspection report.[20]  The inspection report submitted to the Court

contains a section entitled "roof and flashing", which states that the roof was "walked on" and

that "two west hip/ridge shingles are torn and two shingles on west slope over laundry are

torn."[21]  Additionally, the report states:

> Bottom of valley over [] laundry appears to be leaking or gutters have backed up
> as fascia board is rotten behind metal wrap. (Visible from rear attic area).  All
> valleys have some pine needles on them which need to be removed.  Shingles also
> have caulked nail holes in random areas where toe-boards were applied during
> construction.  Caulk may deteriorate with long term sun exposure and will need to
> be maintained.[22]

Defendants agreed to all repairs except for the removal of pine needles on the roof.[23]

On October 14, 2005, the Morgans completed the sale of their home to the Plaintiffs,

Steve Trimble and Tina Gill.  However, Plaintiffs allowed the Morgans to remain in the home

until October 19, 2005.[24]  On October 27, 2005, Plaintiffs signed a form stating:

> BUYER WARRANTS, REPRESENTS AND ACKNOWLEDGES THAT
> BUYER AND ALL PERSONS OR ENTITIES DESIRED BY BUYER HAVE
> INSPECTED THE PROPERTY TO THE FULLEST EXTENT DESIRED BY
> BUYER AND FIND THE CONDITION OF THE PROPERTY ACCEPTABLE
> IN ALL RESPECTS. . . . THE FACT THAT THE BUYER COMPLETES THE

---

[19]Exhibit I, Repair Addendum, Defendants' Motion.

[20]Exhibit I, Repair Addendum, Defendants' Motion.

[21]Exhibit F, Trimble Dep. Attachment 2 - Inspection Report, Defendants' Motion.

[22]Exhibit F, Trimble Dep. Attachment 2 - Inspection Report, Defendants' Motion.

[23]Exhibit I, Repair Addendum, Defendants' Motion.

[24]Exhibit F, Trimble Dep. p. 28-29, Defendants' Motion.

PURCHASE OF THIS PROPERTY WARRANTS THAT THE BUYER IS COMPLETELY SATISFIED WITH THE CONDITION OF THE PROPERTY.

After the Morgans moved out, but before Plaintiffs moved in, Plaintiffs hired painters to paint the entire interior of the home and had the carpets cleaned.[25]  Mr. Trimble testified that sometime between October 19, 2005, and November 22, 2005, but prior to any trees being removed, he noticed several inches of standing water in the backyard after it had rained.[26]  Prior to moving in, Plaintiffs had nine mature trees removed from the yard by Mr. Schroeder, but Mr. Schroeder did not have the proper equipment to remove additional trees.[27]  Mr. Trimble testified in his deposition that while the painters were in the house, it rained one time and he witnessed water running down a rafter inside the attic near the dormer area, but he did not call anyone to check out the problem.[28]  Plaintiffs moved onto the Property on November 22, 2005.[29]

In January of 2006, Plaintiffs hired James Tree and Crane Service to remove thirteen mature trees.[30] According to Mr. Trimble, in January of 2006, one of the workers for James Tree and Crane Service reported a fist-sized hole in the roof above the dormer window.[31]  Mr. Trimble had the hole repaired approximately a week later because rain was predicted.[32]

---

[25]Exhibit F, Trimble Dep. p. 29, Defendants' Motion.

[26]Exhibit D, Trimble Dep. p. 67, Plaintiff's Response to Defendants' Motion.

[27]Exhibit F, Trimble Dep. p. 31-34, Defendants' Motion.

[28]Exhibit F, Trimble Dep. p. 53-54, Defendants' Motion.

[29]Exhibit F, Trimble Dep. p. 25, Defendants' Motion.

[30]Exhibit F, Trimble Dep. p. 42-43, Defendants' Motion.

[31]Exhibit F, Trimble Dep. p. 46, Defendants' Motion.

[32]Exhibit F, Trimble Dep. p. 48, Defendants' Motion.

Mr. Trimble testified that the commodes would back up and overflow approximately every three weeks, so he had Plumbco come out, and "when they rodded it, they retrieved dental floss."[33]  Mr. Trimble testified that he later discovered water coming into the master bedroom and the master bathroom.[34]  In April of 2006, Plaintiffs replaced the roof, but Mr. Trimble testified at his deposition that replacing the roof did not fix the problem.[35]  Also, Mr. Trimble testified during April of 2006, he videotaped the surface water problem.[36]  He stated that the backyard had up to eight inches of standing water after it rained,[37] and it took two to four days to drain.[38]

As to the air conditioner, Mr. Trimble testified that it would constantly run on a hot day, and did not adequately cool the upstairs.[39]  Mr. Rand Brewer and another air conditioning company came to the home and informed them that the upstairs unit needed to be approximately a three to three and a half ton unit, but that it is currently a two ton unit.[40]

Mr. Trimble also testified that the square footage quoted to them was incorrect, and that in May of 2006, the Pulaski County Assessor's office came to the house, reassessed, and lowered

---

[33]Exhibit D, Trimble Dep. p. 93, Plaintiff's Response to Defendants' Motion.

[34]Exhibit F, Trimble Dep. p. 56, Defendants' Motion.

[35]Exhibit F, Trimble Dep. p. 59, Defendants' Motion.

[36]Exhibit D, Trimble Dep. p. 67, Plaintiff's Response to Defendants' Motion.

[37]Exhibit D, Trimble Dep. p. 64, Plaintiff's Response to Defendants' Motion.

[38]Exhibit D, Trimble Dep. p. 68, Plaintiff's Response to Defendants' Motion.

[39]Exhibit D, Trimble Dep. p. 94-95, Plaintiff's Response to Defendants' Motion.

[40]Exhibit D, Trimble Dep. p. 94-95, Plaintiff's Response to Defendants' Motion.

8

the square footage listed for the house from 2,960 to 2,743 square feet.[41] Mr. Trimble further testified that as of the day of his deposition on January 22, 2007, he and Ms. Gill have up to four inches of standing water in their backyard after it rains, noting that the City had done some modifications that have improved the situation.[42]

## II.  Summary Judgment Standard

Summary judgment is appropriate only when, in reviewing the evidence in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, so that the dispute may be decided solely on legal grounds.  *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987);  Fed. R. Civ. P. 56.  The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial-- whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The Eighth Circuit set out the burdens on the parties in connection with a summary judgment motion in *Counts v. M.K. Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988):

> [T]he burden on the party moving for summary judgment is only to demonstrate, i.e., '[to] point[] out to the District Court,' that the record does not disclose a genuine dispute on a material fact.  It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion.  Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence,

---

[41]Exhibit D, Trimble Dep. p. 89, Plaintiff's Response to Defendants' Motion.

[42]Exhibit D, Trimble Dep. p. 64, Plaintiff's Response to Defendants' Motion.

specific facts, showing that there is a genuine dispute on that issue.  If the
respondent fails to carry that burden, summary judgment should be granted.

*Id*. at 1339 (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-74 (8th

Cir. 1988) (citations omitted)(brackets in original)).

"A party seeking summary judgment always bears the initial responsibility of informing

the district court of the basis for its motion, and identifying those portions of [the record] . . .

which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v.

Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  However, the moving party

is not required to support its motion with affidavits or other similar materials negating the

opponent's claim.  *Id*.

Once the moving party demonstrates that the record does not disclose a genuine dispute

on a material fact, the non-moving party may not rest upon the mere allegations or denials of his

pleadings, but his response, by affidavits or as otherwise provided in Rule 56, must set forth

specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. Rule 56(e).  The

plain language of Rule 56(c) mandates the entry of summary judgment against a non-moving

party which, after adequate time for discovery, fails to make a showing sufficient to establish the

existence of an element essential to its case, and on which that party will bear the burden of proof

at trial.  *Celotex Corp.*, 477 U.S. at 322.

## III.  Motion for Summary Judgment

In this diversity action, Plaintiffs' claims are based solely on the tort of fraud.  Fraud has

five elements: (1) a false representation, usually of a material fact; (2) knowledge or belief by the

defendant that the representation was false or that the defendant lacked a sufficient basis of

information to make the statement, that is, the scienter requirement; (3) the intent to induce the

plaintiff to act or to refrain from acting in reliance upon the representation; (4) justifiable reliance

by the plaintiff upon the representation; and (5) resulting damage to the plaintiff. *See* Howard W.

Brill, *Law of Damages*, § 33:8, p. 616-17 (5th ed. 2004).

Defendants first argue that Plaintiffs' claim fails because each of their disclosures were

truthful and honest to the best of their knowledge.  In *O'Mara v. Dykema*, 328 Ark. 310, 316, 942

S.W.2d 854, 857 (1997), the Arkansas Supreme Court upheld the trial court's grant of summary

judgment when the plaintiff buyers failed to produce a genuine issue of material fact that the

defendant sellers knew the dryvit (a plastic material similar to stucco), which made up the

exterior walls of the house, was defective or that the sellers falsely represented to the buyers that

it was not defective.  There, the plaintiffs asserted in affidavits that one of the defendants told

them she had problems with the dryvit contractor that were never resolved.  *Id*.  However, that

defendant stated in her affidavit that the dryvit contractor who did the original work on the home

did not show up on time and did not finish his work on time.  *Id*.  The Court held that the

plaintiff buyers failed to meet proof with proof because they brought forth no specific facts

indicating that the defendant sellers "experienced problems with the dryvit itself or knew it was

defective, much less that they falsely represented these facts."  *Id*. at 316-17, 942 S.W.2d at 857-

58 (stating "Representations are considered fraudulent when the one making them either knows

them to be false or, not knowing, asserts them to be true.").  *See also Morris v. Rush*, 77 Ark.

App. 11, 17-18, 69 S.W.3d 876, 880 (2002) (upholding the trial court's ruling that sellers did not

fraudulently induce the buyers when the buyers did not allege that the sellers made any false

representations and the contract and depositions of the sellers demonstrated that the buyers were relying on their own professional inspectors, and not any representation by the sellers).

In support of their motion, Defendants submit several affidavits. The Morgans state in their affidavits that during their six years in the home, they never made any structural changes to the home, never painted the interior of the home and only experienced a few minor problems.[43] The Morgans also state that they answered all of the questions contained in the seller disclosure form truthfully and honestly, and did not lie or misrepresent anything about the home or its condition.[44] The Morgans further state that they never had any problems with water leaks, the roof, flooding, surface water, drainage, the upstairs air conditioning unit, the commodes, or the plumbing.[45]

The Morgans state that the picture that Plaintiffs claim was taken before the closing, which depicts a small black spot that Plaintiff state is the fist-sized hole in the roof, was taken after they had closed on the home and vacated the property because their grill is not in the picture, the curtains had been removed, and several trees had been removed.[46] They state that they did not move the grill or patio furniture until they vacated the property, and the Plaintiffs

---

[43]Exhibit A, Charles Morgan Affidavit, Defendants' Motion; Exhibit B, Margie Morgan Affidavit, Defendants' Motion.

[44]Exhibit A, Charles Morgan Affidavit, Defendants' Motion; Exhibit B, Margie Morgan Affidavit, Defendants' Motion.

[45]Exhibit A, Charles Morgan Affidavit, Defendants' Motion; Exhibit B, Margie Morgan Affidavit, Defendants' Motion.

[46]Exhibit A, Charles Morgan Affidavit, Defendants' Motion.

12

had the trees removed after they vacated the property.[47]  They state that they never saw the black

spot while they owned the home.[48]

As to the square footage issue, Mr. Morgan states that when he bought the home, the

seller told him that the home was 3,100 square feet, and attaches the multi-listing service

summary from that time, which also reflected that the home had 3,100 square feet.[49]  The

Morgans state that the square footage information used in the sale of their home was provided by

Walt Dickinson, their real estate agent.[50]  Mr. Dickinson's affidavit states that he provided the

Morgans with the square footage to be included on the disclosure sheet, and obtained this

information from the Pulaski County real estate records, which he attaches.[51]  The multi-listing

summary identifies the "Courthouse" as the "Source of Square Feet."[52]  The real estate records

list the home as consisting of 2,960 square feet, but Mr. Dickinson states that he made a

typographical error when he listed the home at 2,968 square feet.[53]  Mr. Dickinson also states that

he provided a pamphlet to potential buyers, which is attached and states, "***Approximately 2968***

---

[47]Exhibit A, Charles Morgan Affidavit, Defendants' Motion; Exhibit B, Margie Morgan Affidavit, Defendants' Motion.

[48]Exhibit A, Charles Morgan Affidavit, Defendants' Motion; Exhibit B, Margie Morgan Affidavit, Defendants' Motion.

[49]Exhibit A, Charles Morgan Affidavit, Defendants' Motion.

[50]Exhibit A, Charles Morgan Affidavit, Defendants' Motion; Exhibit B, Margie Morgan Affidavit, Defendants' Motion.

[51]Exhibit E, Dickinson Affidavit, Defendants' Motion.

[52]Exhibit E, Dickinson Affidavit, Defendants' Motion.

[53]Exhibit E, Dickinson Affidavit, Defendants' Motion.

**square feet.  This is strictly an estimate and not guaranteed. We welcome anyone to measure this property.**"  The Morgans argue that Plaintiffs claim that the Morgans defrauded them by using (and clearly disclosing that they were using) the square footage set forth in the Pulaski County Real Estate records at that time, while relying on those same records, as revised, to support their claim.

The Morgans also rely upon the testimony of the Plaintiffs.  Mr. Trimble testified in his deposition that he does not have any evidence that the Defendants knew about water coming in the dormer attic or about any problems with the roof.[54]  Also, Ms. Gill testified that she has no evidence or basis to think that the Morgans knew that there was a hole in the roof above the dormer window.[55]  Mr. Trimble also testified that he has no evidence that the Defendants knew or were aware of any water leaking.[56]  Mr. Trimble stated that he had no evidence or information that the Defendants ever had any problems with the commodes or overflow.[57]  Mr. Trimble testified that he did not know whether the air conditioner was the original unit.[58]  He also testified that he had no evidence that the Morgans ever had any problems with the air conditioner.[59]  Furthermore, Ms. Gill testified that the air conditioner cools well enough for her.[60]

---

[54]Exhibit F, Trimble Dep. p. 55, Defendants' Motion.

[55]Exhibit E, Gill Dep. p. 15, Plaintiffs' Response to Defendants' Motion.

[56]Exhibit D, Trimble Dep. p. 63, Plaintiffs' Response to Defendants' Motion.

[57]Exhibit D, Trimble Dep. p. 93-94, Plaintiffs' Response to Defendants' Motion.

[58]Exhibit D, Trimble Dep. p. 95, Plaintiffs' Response to Defendants' Motion.

[59]Exhibit D, Trimble Dep. p. 95, Plaintiffs' Response to Defendants' Motion.

[60]Exhibit E, Gill Dep. p. 30, Plaintiffs' Response to Defendants' Motion.

As to the drainage issues, when asked whether he had any evidence or information that the Morgans had any problems with standing water in their yard, Mr. Trimble stated:

> The only thing I was told by the local neighbors is that he was part of a neighborhood group, trying to get something done about the water, that's just from the neighbors talking to me.  I've never talked to Mr. Morgan about that and Mr. Morgan never informed me about any of that as well.  In fact, on the Seller Disclosure, it absolutely says there is no problem.[61]

When asked if he knew "if the Morgans ever had any problem with surface water in their backyard," Mr. Trimble replied, "They have never told us that."[62]  Also, when asked if he had any evidence that the Morgans were not telling the truth when they testified that they did not have any problems with surface water, Mr. Trimble stated, "I couldn't say so."[63]  Ms. Gill also testified that she has no evidence, knowledge, or information that the Morgans experienced these types of problems.[64]

In opposition to Defendants' Motion for Summary Judgment, Plaintiffs submit the deposition testimony of their two neighbors, James Christopher and Stan Crocker .  Mr. Christopher, who lives between the residences of the Plaintiffs and Mr. Crocker, testified that he has had problems with surface water accumulation on his property.[65]  He further testified that he had discussions with the City of Maumelle in 2004, 2005, and 2006.[66]  Mr. Christopher stated

---

[61]Exhibit D, Trimble Dep. p. 76-77, Plaintiffs' Response to Defendants' Motion.

[62]Exhibit D, Trimble Dep. p. 77, Plaintiffs' Response to Defendants' Motion.

[63]Exhibit D, Trimble Dep. p. 77, Plaintiffs' Response to Defendants' Motion.

[64]Exhibit E, Gill Dep. p. 26, Plaintiffs' Response to Defendants' Motion.

[65]Exhibit A, Christopher Dep. p. 5, Plaintiffs' Response to Defendants' Motion.

[66]Exhibit A, Christopher Dep. p. 6, Plaintiffs' Response to Defendants' Motion.

that Mr. Morgan participated in the first two discussions with the City of Maumelle, and that he

assumed that Mr. Morgan was having problems with surface water, but that he had never

witnessed these problems on Mr. Morgan's property.[67]  Mr. Christopher also testified as follows:

> Q.  Okay.  When you met with the City of Maumelle officials in 2004, on the two occasions that Mr. Morgan participated in those meetings, did you ever hear him voice any sentiment one way or the other about his property?
>
> A.  Yes.
>
> Q.  What did he say?
>
> A.  I don't recall the exact words but I would – we were all there because there was drainage situations that had not been corrected as far as we were concerned by the city.
>
> Q.  And can you give me – I know I don't – I'm not asking for the exact language but what the substance of his comments would have been?
>
> A.  From the standpoint that we all had the same drainage problem.  But I have personally not seen his water drainage at any time because I have not been in his backyard during that time.
>
> Q.  But he was actively participating in the conversations?
>
> A.  He was.
>
> Q.  And made it appear that he was involved with the situation just as you were?
>
> A.  He was.
>
> . . .
>
> Q.  So you don't remember ever discussing any sort of problem on Mr. Morgan's property in particular?
>
> A.  I honestly do not, except there at the meeting, but obviously, he expressed some dissatisfaction or he probably wouldn't have gone to our meetings but I have no knowledge specifically.
>
> . . .
>
> Q.  Is it not true that you told me when we met that you thought Mr. Morgan was going to help support you and Mr. Crocker in your efforts to having your problems on your property resolved?
>
> A.  I would say "yes" to that.  Because if I had a problem, the root of the problem was what he was interested in seeing that was taken care of, which was water

_____

[67]Exhibit A, Christopher Dep. p. 6, Plaintiffs' Response to Defendants' Motion.

coming from two cul-de-sacs into Stan's and then over on me and that's where water was seeping through my yard and going out.  We had a lot of people supporting us during that time that did not have a water problem.

. . .

Q. . . . Do you recall Mr. Morgan complaining specifically about his property?

A.  I will say again he was interested in the drainage or he wouldn't have been with the mayor.  But specifically what he may have said to me or not said to me, I cannot recall.

Q.  Can you recall what he said to the mayor?

A.  No.[68]

Mr. Crocker testified that he also has experienced a lot of surface water accumulation on his property when it rains.[69]  However, he testified that he did not know if water accumulated on the Morgan's property and he never saw "the Morgan property when it was raining like that."[70] Mr. Crocker stated that neither of the Morgans told him or complained to him about any problems on their property.[71]  He also testified that at the meetings with the City of Maumelle, he was "not sure if [Mr. Morgan] participated verbatim with what was going on or if he was there just to provide support for me and Mr. Christopher.  I don't know but I know he was there.  I don't honestly recall if or if not that he talked any but he was at the meetings, at least two of

---

[68]Exhibit A, Christopher Dep. p. 9-13, Plaintiffs' Response to Defendants' Motion.

[69]Exhibit B, Crocker Dep. p. 5, Plaintiffs' Response to Defendants' Motion.

[70]Exhibit B, Crocker Dep. p. 7, 12, Plaintiffs' Response to Defendants' Motion.

[71]Exhibit B, Crocker Dep. p. 16, Plaintiffs' Response to Defendants' Motion.

them."[72]   Mr. Crocker stated that he did not recall Mr. Morgan specifically complaining about

any problems on his lot during the meetings with the City of Maumelle.[73]

Plaintiffs also submit the deposition testimony of Mizan Rahman, the city engineer for

the City of Maumelle.[74]   Mr. Rahman stated that he did not recall the Morgans complaining about

problems on their lot, and was not personally aware of any surface water problems on their lot.[75]

However, Mr. Morgan testified in his deposition as follows:

> Mr. Christopher had gone through the neighborhood trying to recruit people to
> support him and his quests.  He said that he had water in his backyard that was
> damaging his tomatoes and he wanted to go to the city council in order to see if
> they could do anything about protecting his garden.  He's a dear fellow to all of us
> and so Margie would encourage me to go because he has had a history of strokes.
> And so several of us went to support him and his quest.
>
> . . .
>
> While I lived on the property, there was no surface water problem.[76]

As discussed by the Defendants, the cases of *Beatty v. Haggard*, 87 Ark. App. 75, 184

S.W.3d 479 (2004) and *Riley v. Hoisington*, 80 Ark. App. 346, 96 S.W.3d 743 (2003), cited by

the Plaintiffs are distinguishable from the case at bar.  In *Beatty*, a case involving constructive

fraud, the defendant sellers admitted that they excavated and poured additional concrete along the

footing.  87 Ark. App. At 85, 184 S.W.3d at 486.  There, the primary disagreement was the

---

[72]Exhibit B, Crocker Dep. p. 11, Plaintiffs' Response to Defendants' Motion.

[73]Exhibit B, Crocker Dep. p. 13, Plaintiffs' Response to Defendants' Motion.

[74]Exhibit C, Rahman Dep. p. 4, Plaintiffs' Response to Defendants' Motion

[75]Exhibit C, Rahman Dep. p. 10, 14, Plaintiffs' Response to Defendants' Motion

[76]Exhibit C, Charles Morgan Dep. p. 18-20, Defendants' Motion.

interpretation of one of the disclosure statements regarding "structural modifications or other alterations or repairs made to the Property since the Property was originally constructed," and whether the excavation and addition of concrete constituted a "repair," or was simply cosmetic. *Id*.  However, the defendant sellers themselves referred to the work as a "repair," and told the plaintiff buyers that the additional concrete was there for reinforcement.  *Id*.  The court also held that the "as is" clause in the real estate contract did not relieve the defendants from liability because "an 'as is' clause does not bar an action by the vendee based on claims of fraud or misrepresentation."  *Id*.  Additionally, the court held that the "Buyer's Disclaimer of Reliance" clause excluded "any written disclosures provided by the seller."  *Id*.  Here, there is no evidence that Defendants made any alterations such as those in *Beatty*.

Furthermore, in *Barringer v. Hall*, 89 Ark. App. 293, 303, 202 S.W.3d 568, 574-75 (2005), the Arkansas Court of Appeals distinguished *Beatty* by noting that there is no indication that the buyers in *Beatty* signed a disclaimer stating that the buyers found the condition of the property acceptable in all respects, and by completing the purchase, warranted that they were completely satisfied with the property.  The court also noted that *Beatty* did not discuss the effect of language in the owner disclosure form that representations were made to the best of the owners' knowledge, that the owner had no expertise in certain areas, and that the disclosure form was not a substitute for an inspection, although the court was determining whether substantial evidence supported the jury's verdict.  *Id*.

In *Riley*, the defendant seller provided plaintiffs with a disclosure statement stating that there had not been any "flooding, drainage, grading problems . . ." on the real estate.  80 Ark. App. at 349, 96 S.W.3d at 745.  However, the defendant seller testified that he had previous

water drainage problems, water came up through a crack in the floor and soaked the entire carpet in the basement four to five years before the sale of the home, and after the seller learned of the buyer's flooding in the basement, he visited them and discussed the previous water damage and crack in the basement floor. *Id*. at 351, 96 S.W.3d at 747. Here, Defendants maintain that they have never had any of the problems encountered by the Plaintiffs.

The Court finds that Plaintiffs have failed to produce a genuine issue of material fact that the Defendants knew or believed that their representations on the Seller Property Disclosure were false. Even if some of the alleged defects existed at the time Defendants occupied the home, Plaintiffs present no evidence that Defendants knew about any of the problems. Plaintiffs simply argue that "what was experienced by the plaintiffs, as vividly depicted in the video, must have existed while the Morgans lived on the property." The Court notes that it is clear from the record that although the Morgans' neighbors experienced drainage issues, they do not recall any complaints by the Plaintiffs about their own property. Furthermore, the Court agrees that Plaintiffs cannot argue that the Morgans defrauded them by using (and clearly disclosing that they were using) the square footage set forth in the Pulaski County Real Estate records at that time, while relying on those same records, as revised, to support their claim. Plaintiffs have presented no evidence that the Morgans knew or believed that their representation on the Seller Property Disclosure regarding the square footage was false. Plaintiffs' evidence is comprised entirely of conjecture and surmise, and fails to support their claim. Defendants' motion is granted.

**IV.  Motion to Exclude Testimony (Docket No. 13)**

Defendants move this Court for an Order excluding the proposed expert testimony of

Byron McKimmey, a real estate agent.  However, Defendants state that if their Motion for

Summary Judgment is granted, the Motion to Exclude is moot.  The Motion to Exclude is denied

as moot.

Accordingly,

IT IS THEREFORE ORDERED THAT Defendants' Motion for Summary Judgment

(Dkt.# 15) shall be, and it is hereby, GRANTED.

IT IS FURTHER ORDERED THAT Defendants' *Daubert* Motion to Exclude Testimony

of Plaintiffs' Expert, Mr. Byron McKimmey (Dkt.# 13) shall be, and it is hereby, DENIED as

moot.

Dated this 9th day of July, 2007.

/s/Garnett Thomas Eisele
UNITED STATES DISTRICT JUDGE